Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Richard R. Barker
Michael J. Ellis
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAR 0 7 2023

SEAN F. McAVOY, CLERK
SPOKANE, WASHINGTON

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | Case No.: 2:22-CR-00157-TOR-3 |
|---|---|
| Plaintiff, | Plea Agreement |
| v. | |
| CURRY A. PINKHAM, | |
| Defendant. | |

Plaintiff United States of America, by and through Vanessa R. Waldref, United States Attorney the Eastern District of Washington, and Richard R. Barker and Michael J. Ellis, Assistant United States Attorneys for the Eastern District of Washington, and Defendant Curry A. Pinkham ("Defendant"), both individually and by and through Defendant's counsel, Zachary L. Ayers, agree to the following Plea Agreement.

    1.   <u>Waiver of Indictment</u>

    Defendant, having been advised of the right to be charged by Indictment, agrees to waive that right and enter a plea of guilty to the charges brought by the United States in an Information.

//
//
//

PLEA AGREEMENT - 1

2.    <u>Guilty Plea and Maximum Statutory Penalties</u>

Defendant agrees to enter a plea of guilty to the Information filed March 7, 2023, which charges Defendant with the offenses listed below.  Defendant understands that the following potential penalties apply to these offenses:

    a.    Attempted Robbery in Indian Country, in violation of 18 U.S.C. §§ 2111, 1153, 2 (Count 1);

        i.    a term of imprisonment of up to fifteen years;

        ii.    a term of supervised release of up to three years;

        iii.    a fine of up to $250,000; and

        iv.    a $100 special penalty assessment.

    b.    Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8) (Count 2);

        i.    a term of imprisonment of up to fifteen years;

        ii.    a term of supervised release of up to three years;

        iii.    a fine of up to $250,000; and

        iv.    a $100 special penalty assessment.

    c.    Attempting to Elude a Pursuing Police Vehicle, in violation of 18 U.S.C. §§ 13, 1152, Wash. Rev. Code § 46.61.024 (Count 3);

        i.    a term of imprisonment of up to five years;

        ii.    a term of supervised release of up to three years;

        iii.    a fine of up to $250,000; and

        iv.    a $100 special penalty assessment.

    d.    Attempted Murder of a Federal Officer, in violation of 18 U.S.C. §§ 1114, 1113, 2 (Count 4);

        i.    a term of imprisonment of up to twenty years;

        ii.    a term of supervised release of up to three years;

        iii.    a fine of up to $250,000; and

        iv.    a $100 special penalty assessment.

  e. Assault on a Federal Officer, in violation of 18 U.S.C.

   §§ 111(a)(1), (b), 2 (Count 5);

    i. a term of imprisonment of up to twenty years;

    ii. a term of supervised release of up to three years;

    iii. a fine of up to $250,000; and

    iv. a $100 special penalty assessment.

  f. Discharge of a Firearm During and in Relation To a Crime of

   Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 2

   (Count 6)

    i. a term of imprisonment of not less than ten years, up to

     life, to be served consecutively to any other term of

     imprisonment;

    ii. a term of supervised release of up to five years;

    iii. a fine of up to $250,000; and

    iv. a $100 special penalty assessment.

3. <u>Supervised Release</u>

Defendant understands that if Defendant violates any condition of Defendant's supervised release, the Court may revoke Defendant's term of supervised release, and require Defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post release supervision, up to the following terms:

  a. 5 years in prison if the offense that resulted in the term of

   Supervised Release is a class A felony,

  b. 3 years in prison if the offense that resulted in the term of

   Supervised Release is a class B felony, and/or

  c. 2 years in prison if the offense that resulted in the term of

   Supervised Release is a class C felony.

PLEA AGREEMENT - 3

Accordingly, Defendant understands that if Defendant commits one or more violations of supervised release, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

4.    The Court is Not a Party to this Plea Agreement

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

a.    sentencing is a matter solely within the discretion of the Court;

b.    the Court is under no obligation to accept any recommendations made by the United States or Defendant;

c.    the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

d.    the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

e.    the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

f.    the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

5.    Potential Immigration Consequences of Guilty Plea

If Defendant is not a citizen of the United States, Defendant understands the following:

a.    pleading guilty in this case may have immigration consequences;

PLEA AGREEMENT - 4

b.    a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

c.    removal from the United States and other immigration consequences are the subject of separate proceedings; and

d.    no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail.

6.    <u>Waiver of Constitutional Rights</u>

Defendant understands that by entering this guilty plea, Defendant is knowingly and voluntarily waiving certain constitutional rights, including the following:

a.    the right to a jury trial;

b.    the right to see, hear and question the witnesses;

c.    the right to remain silent at trial;

d.    the right to testify at trial; and

e.    the right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands that Defendant retains the right to be assisted by an attorney through the sentencing proceedings in this case and any direct appeal of Defendant's conviction and sentence, and that an attorney will be appointed at no cost if Defendant cannot afford to hire an attorney.

Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

PLEA AGREEMENT - 5

7. <u>Elements of the Offenses</u>

    a.   <u>Attempted Robbery in Indian Country</u>

The United States and Defendant agree that to convict Defendant of Attempted Robbery in Indian Country, in violation of 18 U.S.C. §§ 2111, 1153, 2, as charged in Count 1, the United States would have to prove the following beyond a reasonable doubt.

    1. *First*, on or about October 20, 2022, Defendant attempted to take from the person or presence of another anything of value;

    2. *Second*, Defendant did so by force and violence, or by intimidation;

    3. *Third*, the attempted robbery occurred at a place within the Confederated Tribes of the Colville Reservation, which is in Indian country;

    4. *Fourth*, Defendant is an Indian and an enrolled member of the Nez Perce Tribe; and

    5. *Fifth*, the Nez Perce Tribe is federally recognized.

    b.   <u>Felon in Possession of a Firearm</u>

The United States and Defendant agree that to convict Defendant of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8), as charged in Count 2, the United States would have to prove the following beyond a reasonable doubt.

    1. *First*, on or about October 20, 2022, Defendant knowingly possessed a firearm;

    2. *Second*, the firearm had been shipped or transported from one state to another;

    3. *Third*, at the time Defendant possessed the firearm, Defendant had been convicted of a crime punishable by imprisonment for a term exceeding one year; and

4. *Fourth*, at the time Defendant possessed the firearm, Defendant knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

c.    <u>Attempting to Elude a Pursuing Police Vehicle</u>

The United States and Defendant agree that to convict Defendant of Attempting to Elude a Pursuing Police Vehicle, in violation of 18 U.S.C. §§ 13, 1152, Wash. Rev. Code § 46.61.024, as charged in Count 3, the United States would have to prove the following beyond a reasonable doubt.

1. *First*, on or about October 20, 2022, Defendant drove a motor vehicle;

2. *Second*, Defendant was signaled to stop by a uniformed police officer by hand, voice, emergency light, or siren;

3. *Third*, the signaling police officer's vehicle was equipped with lights and sirens;

4. *Fourth*, Defendant willfully failed or refused to immediately bring the vehicle to a stop after being signaled to stop;

5. *Fifth*, while attempted to elude a pursuing police vehicle, Defendant drove his vehicle in a reckless manner;

6. *Sixth*, the attempting to elude a pursuing police vehicle occurred at a place within the Confederated Tribes of the Colville Reservation, which is in Indian country;

7. *Seventh*, Defendant is an Indian and an enrolled member of the Nez Perce Tribe; and

8. *Eighth*, the Nez Perce Tribe is federally recognized.

d.    <u>Attempted Murder of a Federal Officer</u>

The United States and Defendant agree that to convict Defendant of Attempted Murder of a Federal Officer, in violation of 18 U.S.C. §§ 1114, 1113, 2, as charged in

1  Count 4, the United States would have to prove the following beyond a reasonable
2  doubt.

3      1. *First*, someone else committed Attempted Murder of a Federal
4        Officer;

5      2. *Second*, Defendant aided that person with respect to at least one
6        element of Attempted Murder of a Federal Officer;

7      3. *Third*, Defendant acted with the intent to facilitate Attempted
8        Murder of a Federal Officer; and

9      4. *Fourth*, Defendant acted before the crime was completed.

10    e.   <u>Assault on a Federal Officer</u>

11      The United States and Defendant agree that to convict Defendant of Assault on
12  a Federal Officer, in violation of 18 U.S.C. §§ 111(a)(1), (b), 2, as charged in Count
13  5, the United States would have to prove the following beyond a reasonable doubt.

14      1. *First*, someone else committed Assault on a Federal Officer;

15      2. *Second*, Defendant aided that person with respect to at least one
16        element of Assault on a Federal Officer;

17      3. *Third*, Defendant acted with the intent to facilitate Assault on a
18        Federal Officer; and

19      4. *Fourth*, Defendant acted before the crime was completed.

20    f.   <u>Discharge of a Firearm During and In Relation to a Crime of
21      Violence</u>

22      The United States and Defendant agree that to convict Defendant of Discharge
23  of a Firearm During and in Relation to a Crime of Violence, in violence of 18 U.S.C.
24  §§ 924(c)(1)(A)(iii), 2, as charged in Count 6, the United States would have to prove
25  the following beyond a reasonable doubt.

26      1. *First*, someone else committed Discharge of a Firearm During and
27        in Relation To a Crime of Violence;

28

PLEA AGREEMENT - 8

2. *Second*, Defendant aided that person with respect to at least one element of Discharge of a Firearm During and in Relation to a Crime of Violence;

3. *Third*, Defendant acted with the intent to facilitate Discharge of a Firearm During and in Relation to a Crime of Violence; and

4. *Fourth*, Defendant acted before the crime was completed.

8.    Factual Basis and Statement of Facts

The United States and Defendant stipulate and agree to the following: the facts set forth below are accurate; the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea.

The United States and Defendant agree that this statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the Sentencing Guidelines computation or sentencing, unless otherwise prohibited in this Plea Agreement.

**Introduction**

On October 20, 2022, ZACHARY L. HOLT, with help from DEZMONIQUE D. TENZSLEY, shot and killed G. N.-S. and J.N. in Keller, Washington. Both G. N.-S. and J.N. are enrolled members of federally recognized Tribes. The shootings occurred during an attempted robbery at the trailer where the victims were residing, which is within the external boundaries of the Confederated Tribes of the Colville Reservation. CURRY A. PINKHAM participated in the planned robbery and also was armed with a shotgun during the shooting.

After the victims were killed, and while law enforcement was responding to the scene, TENZSLEY, HOLT, and PINKHAM attempted to flee from the Keller area toward Nespelem, Washington. As PINKHAM drove the getaway car, HOLT fired upon Colville Tribal Police Sergeant K.B., who is a commissioned federal officer. Sergeant K.B. was shot in the forearm. After nearly killing Sergeant K.B.,

PLEA AGREEMENT - 9

1    TENZSLEY, HOLT, and PINKHAM continued to evade police: PINKHAM drove

2    the getaway car, while HOLT repeatedly fired a 9mm firearm at law enforcement[1] –

3    including at Sergeant K.B. as well as Sergeant J.C. TENZSLEY assisted by firing a

4    shotgun at law enforcement and reloading 9mm magazines for HOLT. Later, when

5    HOLT, TENZSLEY, and PINKHAM arrived in the Nespelem area, the three men

6    tried to hide the getaway car and fled on foot. Each of the three men were

7    apprehended the next day.

8         All relevant events occurred within the external boundaries of the Colville

9    Reservation. While HOLT and PINKHAM are enrolled Nez Perce, TENZSLEY is

10   not a member of a federally recognized tribe.

11                    **Defendants' Activities Prior to the Homicides**

12        On the morning of the homicides, HOLT, TENZSLEY, PINKHAM, and two

13   women (Jordan MARTIN and M.T., who is a juvenile) were together at PINKHAM's

14   home in Keller, Washington. HOLT and TENZSLEY had traveled to Keller from the

15   area around Lewiston, Idaho approximately two days earlier. When HOLT and

16   TENZSLEY arrived in Keller, they spent considerable time with PINKHAM,

17   MARTIN, and M.T. – traveling on or around the Colville Reservation, drinking

18   alcohol and using drugs together, and shooting firearms. HOLT and TENZSLEY had

19   brought firearms as well as numerous rounds of ammunition with them in a red two-

20   door Honda Civic, which HOLT and TENZSLEY drove from Idaho. While on the

21   Colville Reservation, HOLT made a number of comments about robbing people or

22   "hitting a lick."

23

24   _____

25        [1] The Colville Tribal Police Department is funded by the Bureau of Indian
     Affairs through a 638 Self-Determination Contract. *See* Public Law 93-638. Both
26   Sergeants K.B. and J.C. were engaged in their official duties, which include the
     investigation of violations of federal law, at all times relevant to this case. Sergeant
27   K.B. also has a Special Law Enforcement Credential through the BIA, which
     explicitly authorizes him to investigate violations of federal law.
28

PLEA AGREEMENT - 10

At some point during the morning of October 20, 2022, HOLT, TENZSLEY, PINKHAM, MARTIN, and M.T. traveled to an area near Keller, known locally as the "Mouth." There, members of the group were drinking alcohol and using drugs. HOLT and TENZSLEY pulled out firearms and began target shooting. At some point, the group left the "Mouth" and split up for a short time.

During the afternoon of October 20, 2022, MARTIN and PINKHAM drove MARTIN's red Toyota Camry to the area of 303 Mountain Ridge Road, Keller, Washington, to buy drugs. Around that time, HOLT and TENZSLEY were in the red Honda Civic driving on Jack Creek Road, a dirt road that is a short distance from PINKHAM's residence. HOLT, who was driving at a high rate of speed on the dirt road, had to swerve to miss a local school bus, causing the red Civic to roll over into a ditch.

Minutes later, as PINKHAM and MARTIN were driving back to PINKHAM's home, PINKHAM saw HOLT and TENZSLEY, who were sitting on the side of the road after wrecking the Civic. PINKHAM, MARTIN, HOLT, and TENZSLEY then drove back to PINKHAM's home, where they met up with M.T. The entire group then went to the location of the Civic. There, HOLT and TENZSLEY took three firearms, a large bag of ammunition, and other items out of the Civic. The firearms, ammunition, and other items were placed into the Camry. The firearms included a 9mm semiautomatic firearm, a sawed off .410 caliber Rossi BrazTech shotgun, and a .20 gauge shotgun. The bag of ammunition contained approximately a thousand rounds of various calibers of ammunition. After moving the firearms, M.T. left in a white Audi. The rest of the group – HOLT, TENZSLEY, PINKHAM, and MARTIN – left separately in MARTIN's red Camry. PINKHAM was driving.

**Attempted Robbery and Double-Murder on October 20, 2022**

After wrecking the red Civic in a ditch, HOLT was upset and began demanding that PINKHAM take HOLT to Spokane or elsewhere so HOLT and TENZSLEY could get more drugs and rob someone. HOLT, who was in the

PLEA AGREEMENT - 11

1  backseat, began hitting PINKHAM. Although PINKHAM initially refused to help
2  HOLT rob anyone, PINKHAM ultimately acquiesced and stated he would drive
3  HOLT to the home of a known drug dealer in the Keller area. PINKHAM, who knew
4  the area and previously engaged in drug activity with this dealer, then drove to 303
5  Mountain Ridge Road, which was the same place PINKHAM and MARTIN had
6  gone earlier in the day to buy drugs. The intended target of the robbery was not J.N.
7  and G. N.-S., but another individual, who was believed to have more drugs and
8  money.

9      At about 4:19 p.m. on October 20, 2022, HOLT, PINKHAM, TENZSLEY,
10 and MARTIN arrived at 303 Mountain Ridge Road, which was about a five minute
11 drive from where HOLT wrecked the Honda Civic. HOLT and TENZSLEY put on
12 masks, grabbed firearms, and got out of the Camry and walked toward the back of the
13 residence, where J.N and G. N.-S.'s trailer was located. HOLT had the 9mm
14 semiautomatic firearm and TENZSLEY had the .20 gauge shotgun. PINKHAM –
15 who had originally planned to approach the front door of the residence – returned to
16 the Camry after seeing HOLT and TENZSLEY move towards J.N. and G. N.-S.'s
17 trailer. PINKHAM searched for a mask in the Camry but was unable to find one.
18 About 30 seconds after HOLT and TENZSLEY left the car, PINKHAM took the .410
19 caliber shotgun and followed HOLT and TENZSLEY. MARTIN stayed in the car.

20     HOLT first approached J.N., who was near the door to the trailer. While
21 pointing the 9mm semiautomatic firearm at J.N., HOLT stated something to the
22 effect of, "Where's the shit at, where's the shit? Think I'm fucking playing?"
23 TENZSLEY was standing guard with a .20 gauge shotgun. HOLT then fired multiple
24 gunshots, striking J.N. in the head and leg. After shooting J.N., HOLT fired two shots
25 at G. N.-S., striking her two times, including in the head. After HOLT opened fire,
26 HOLT, TENZSLEY, and PINKHAM ran back to the Toyota Camry. Surveillance
27 video captures the Camry driving away from the murder scene just minutes after the
28

PLEA AGREEMENT - 12

1  Camry pulled into the neighborhood where J.N. and G. N.-S. were shot. Once back in
2  the car, HOLT stated, "That's what I'm about."

3         In the aftermath of the shooting, law enforcement responded to reports of
4  gunshots and a homicide at the trailer in Keller. There, police identified J.N. and
5  G. N.-S., who had been shot and killed. Autopsy reports confirmed that both J.N. and
6  G. N.-S. suffered multiple gunshot wounds, including to the head. A medical
7  examiner concluded that the cause and manner of the deaths was homicide.

8                     **Attempted Murder of Sergeant K.B.**

9         After fleeing from 303 Mountain Ridge Road, PINKHAM, HOLT,
10 TENZSLEY, and MARTIN drove back to PINKHAM's residence and picked up
11 M.T. From there, the entire group drove to another residence about 10-15 minutes
12 away from the murder scene. PINKHAM then changed out a tire on the Camry.

13        Later that afternoon/early evening, HOLT, TENZSLEY, PINKHAM,
14 MARTIN, and M.T. drove to the Keller Store, where members of their group were
15 captured on surveillance video conversing with people in the parking area outside the
16 store. From there, HOLT, TENZSLEY, PINKHAM, MARTIN, and M.T. decided to
17 drive to Owhi Lake, which is about twenty-five miles from Keller. The group then
18 departed the Keller area in the Toyota Camry. PINKHAM was driving; TENZSLEY
19 was in the front passenger seat; HOLT, MARTIN, and M.T. were in the backseat.
20 HOLT was directly behind PINKHAM.

21        After law enforcement was called out to the murder scene, Colville Tribal
22 Police Sergeant K.B. was one of several officers who responded to the call; he
23 traveled from Omak, Washington toward Keller. Sergeant K.B. was in uniform.
24 While en route, Sergeant K.B. heard over his police radio that a red Honda sedan may
25 have been involved in the shooting. As Sergeant K.B. was traveling toward Keller on
26 Cache Creek Road, he passed a red sedan traveling at a high rate of speed away from
27 Keller – i.e., the opposite direction as Sergeant K.B. Upon seeing the sedan, Sergeant
28

1    K.B. made a U-turn to pursue the red sedan, which was MARTIN's red Toyota

2    Camry.

3         Sergeant K.B., who had already activated his lights and siren en route to

4    Keller, followed the red Camry. To catch up, Sergeant K.B. had to drive

5    approximately 80-85 miles per hour, which was well over the posted speed limit for

6    Cache Creek Road. Ultimately, the Camry, which PINKHAM was still driving,

7    pulled over near the turnoff to Owhi Loop Road. Sergeant K.B. parked his police

8    vehicle behind the Camry, and using his patrol car's public announcement system,

9    directed the driver of the car to show his hands. Around this time, HOLT and

10   PINKHAM told MARTIN and M.T. to get out of the car, and the two women

11   promptly did so.

12        Moments later, the Camry again sped off. PINKHAM was still driving,

13   TENZSLEY was in the front passenger seat, and HOLT was in the rear passenger

14   compartment behind PINKHAM. As the Camry was pulling out, HOLT leaned out

15   the rear side door and pointed the 9mm semiautomatic firearm toward Sergeant K.B.

16   and opened fire. During the ensuing chase, HOLT fired numerous 9mm rounds at

17   Sergeant K.B. TENZSLEY also fired one of the shotguns. As the car chase

18   continued, TENZSLEY helped HOLT reload magazines for the 9mm semiautomatic

19   firearm.

20        When Sergeant K.B. saw the firearm, and just before the initial gunshots, he

21   ducked down toward the center console of his police vehicle. He called out that shots

22   were fired and requested backup over his police radio. Sergeant K.B. then continued

23   pursuing the Camry for the next several miles. Throughout, Sergeant K.B.'s lights

24   and sirens remained active. At least once after the initial gunshots, Sergeant K.B.

25   briefly lost sight of the Camry. After rounding a turn, however, Sergeant K.B. again

26   saw the Camry, which was parked on the road approximately one sixteenth of a mile

27   ahead. PINKHAM, still driving the Camry, had, at HOLT's instructions, positioned

28   the Camry to allow HOLT a better line-of-sight towards Sergeant K.B. Sergeant K.B.

PLEA AGREEMENT - 14

then saw a person on the rear driver's side aiming a firearm toward Sergeant K.B. When Sergeant K.B. came around the turn, the gunman fired a single shot, which went through the windshield of Sergeant K.B.'s patrol car and struck him in the forearm. The red Camry then drove away.

After being shot, Sergeant K.B. accidentally shifted his police car into neutral, momentarily lost control of the car, and slowed down. When he regained control of his car, Sergeant K.B. continued to pursue and called out over the radio that he had been hit. Eventually, Sergeant K.B. regained visual contact of the red Camry and saw that it was backed into a dirt road up ahead. The driver-side of the red sedan was facing Sergeant K.B., who slowed down to keep his distance. The Camry was sitting, seemingly waiting for Sergeant K.B. to catch up. HOLT was seated in the window frame and fired at Sergeant K.B. The gunshot stuck about 40 feet in front of Sergeant K.B.'s car. The Camry then pulled forward slightly, paused briefly, and drove away. Sergeant K.B. continued pursuing from a distance and lost visual contact.

**Assault of Sergeant J.C.**

Coville Tribal Police Sergeant J.C. responded to Sergeant K.B.'s distress calls and radio communications and located the Camry, which was still headed toward Nespelem, Washington.  As the Camry neared the intersection of Ohwi Lake Road and Cache Creek Road, Sergeant J.C. positioned himself to pull over the Camry. He also had his service weapon ready in case the gunmen in the Camry opened fire. As the Camry approached Sergeant J.C., PINKHAM, who was still driving, saw a police car ahead. After briefly stopping the Camry, PINKHAM drove toward Sergeant J.C. at a high rate of speed. As PINKHAM went through the intersection and turned right onto Cache Creek Road toward Nespelem, HOLT and possibly TENZSLEY again opened fire. Sergeant J.C. quickly returned fire, striking the Camry a number of times. Sergeant J.C. was not hit by the gunfire.

In the exchange of gunfire, HOLT and TENZSLEY were struck – either by bullet fragments, shards of metal from gunshots to the car, or glass from the rear

PLEA AGREEMENT - 15

1  windshield. HOLT's leg was bleeding and TENZSLEY had an injury to his arm. One

2  of the car's tires had also been hit, and was now flat. Nonetheless, PINKHAM

3  continued driving toward Nespelem, eluding law enforcement.

### Actions After Eluding Law Enforcement

5  When HOLT, TENZSLEY, and PINKHAM arrived in Nespelem, they

6  abandoned the Camry in the Upper HUD neighborhood. Before leaving the car,

7  HOLT, TENZSLEY, and PINKHAM removed the firearms and the large bag of

8  ammunition from the vehicle. TENZSLEY also grabbed a small black satchel

9  containing ammunition and a 9mm magazine. TENZSLEY and PINKHAM then

10  partially covered the car with a tarp. HOLT, TENZSLEY, and PINKHAM then fled

11  on foot into a gulley by the Upper HUD neighborhood. Not long after abandoning the

12  car, PINKHAM split up from HOLT and TENZSLEY.

13  Shortly after HOLT, TENZSLEY, and PINKHAM arrived in Nespelem,

14  Colville Tribal Police located the car under the tarp. Inside, Colville Tribal Police and

15  the FBI recovered numerous rounds of expended ammunition, an empty magazine,

16  and a radio scanner. Apparent blood stains also were visible inside the car. A number

17  of shotgun shells were scattered about the car, and there was a small puppy on the

18  floorboard. HOLT had taken the puppy from PINKHAM's home prior to the car

19  chase with Colville Tribal Police.

### Defendants' Arrests

21  On October 21, 2022, a community member reported that two men involved in

22  the shootings – later identified as HOLT and TENZSLEY – were on 7th Street in

23  Nespelem, Washington. Colville Tribal Police responded and arrested both HOLT

24  and TENZSLEY. At the time he was placed under arrest, TENZSLEY provided a

25  name other than his own, but during a search incident to arrest, Colville Tribal Police

26  located a debit card in TENZSLEY's legal name. HOLT was taken into custody after

27  getting into a fight with the community member. The fight was partially captured on

28  video.

PLEA AGREEMENT - 16

Later that same day, Colville Tribal Police located PINKHAM in Elmer City, Washington, which is approximately 15 miles from Nespelem. PINKHAM had obtained a ride from a friend, who helped PINKHAM evade law enforcement in the Nespelem area. When police found PINKHAM, he was hiding in the back of a van, under a blanket.

**Firearms Evidence and PINKHAM's Prior Conviction**

During the investigation that followed the murders and shootings, the FBI and Colville Tribal Police recovered the .410 caliber Rossi BrazTech Break Action Single Shot Shotgun in the area where TENZSLEY, HOLT, and PINKHAM fled. Based on markings on the .410 shotgun itself, it was manufactured outside of Washington State. An ATF nexus analysis further confirmed the .410 shotgun had traveled in interstate commerce to reach the Eastern District of Washington. The .410 shotgun is the same firearm PINKHAM possessed during the attempted robbery at 303 Mountain Ridge Road on October 20, 2022.

At the time of the offense, PINKHAM had a prior felony conviction, and knew that he had served more than 12 months in custody on that conviction. Specifically, PINKHAM was convicted in Okanogan County Superior Court of custodial assault and sentenced to 14 months imprisonment.

9.    The United States' Agreements

The United States Attorney's Office for the Eastern District of Washington agrees not to bring additional charges against Defendant based on information in its possession at the time of this Plea Agreement that arise from conduct that is either charged in the Information, in the Indictment, or identified in discovery produced in this case, unless Defendant breaches this Plea Agreement before sentencing.

The United States Attorney's Office for the Eastern District of Washington agrees that at the time of sentencing, the United States will move to dismiss the Indictment filed on November 1, 2022, insofar as it pertains to Defendant, including Counts 1 and 2 which charge Defendant with Assault on a Federal Officer, in

PLEA AGREEMENT - 17

violation of 18 U.S.C. §§ 111(a), (b), 2 (Count 1), and Discharge of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 2 (Count 2).

        10.   <u>United States Sentencing Guidelines Calculations</u>

        Defendant understands and acknowledges that the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") apply and that the Court will determine Defendant's advisory range at the time of sentencing, pursuant to the Guidelines. The United States and Defendant agree to the following:

        a.   <u>Base Offense Level</u>

        The United States and Defendant have no agreement and make no representations about Defendant's base offense level.

        b.   <u>Specific Offense Characteristics</u>

        The United States and Defendant have no agreement and make no representations about the applicability of any specific offense characteristics.

        c.   <u>Multiple Count Analysis</u>

        The United States and Defendant have no agreement and make no representations about the applicability of multiple count analysis.

        d.   <u>Acceptance of Responsibility</u>

        The United States will recommend that Defendant receive a three-level downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), (b) if Defendant does the following:

            i.      accepts this Plea Agreement;

            ii.      enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement;

           iii.      demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

iv.     provides complete and accurate information during the
sentencing process; and

v.      does not commit any obstructive conduct.

The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is convicted of any criminal offense or if Defendant tests positive for any controlled substance.

e.     No Other Agreements

The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances. Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this Agreement, and Defendant's relevant conduct.

f.     Criminal History

The United States and Defendant have no agreement and make no representations about Defendant's criminal history category, which will be determined by the Court after the United States Probation Office prepares and discloses a Presentence Investigation Report.

11.     Incarceration

The United States and Defendant are each free to recommend any lawful term of incarceration.

12.     Supervised Release

The United States and Defendant each agree to recommend that the Court impose a five (5) year term of supervised release. Defendant agrees that the Court's decision regarding the conditions of Defendant's Supervised Release is final and non-appealable; that is, even if Defendant is unhappy with the conditions of Supervised

PLEA AGREEMENT - 19

Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

      a.    The United States Probation Officer may conduct, upon reasonable suspicion, and with or without notice, a search of Defendant's person, residences, offices, vehicles, belongings, and areas under Defendant's exclusive or joint control;

      b.    Defendant shall participate and complete such drug testing and drug treatment programs as the Probation Officer directs; and

      c.    Defendant shall complete mental health evaluations and treatment, including taking medications prescribed by the treatment provider. Defendant shall allow reciprocal release of information between the Probation Officer and the treatment provider. Defendant shall contribute to the cost of treatment according to Defendant's ability.

13.   Criminal Fine

The United States and Defendant may make any recommendation concerning the imposition of a criminal fine. Defendant acknowledges that the Court's decision regarding a fine is final and non-appealable; that is, even if Defendant is unhappy with a fine ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or fine.

14.   Mandatory Special Penalty Assessment

Defendant agrees to pay the $600 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, pursuant to 18 U.S.C. § 3013.

PLEA AGREEMENT - 20

15.    Payments While Incarcerated

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, Defendant agrees to earn money toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

16.    Judicial Forfeiture

Defendant agrees to voluntarily forfeit any and all right, title and interest he has in the following listed assets in favor of the United States, including, but not limited to:

- A .410 caliber Rossi BrazTech Break Action Single Shot Shotgun.

Defendant acknowledges that the assets covered by this agreement are subject to forfeiture:

- as property facilitating or involved in illegal conduct in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8), Felon in Possession of a Firearm; and, and 18 U.S.C. § § 924(c)(1)(A)(iii), 2, Discharge of a Firearm During a Crime of Violence, and are therefore forfeitable to the United States pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c); and,

- as property involved in or used or intended to be used to commit the offense in violation of 18 U.S.C. §§ 1114, 1113, 2, Attempted Murder of a Federal Officer, and are therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(G)(iii), 28 U.S.C. § 2461

Defendant agrees to take all steps as requested by the United States to pass clear title to the assets to the United States and to testify truthfully in any forfeiture proceeding. Defendant agrees to hold all law enforcement agents and the United States, its agents, and its employees harmless from any claims whatsoever arising in connection with the seizure and forfeiture of any asset covered by this agreement.

Defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds,

PLEA AGREEMENT - 21

1 including that the forfeiture constitutes an excessive fine or punishment. Defendant

2 knowingly and voluntarily waives his right to a jury trial on the forfeiture of the

3 asset(s). Defendant waives oral pronouncement of forfeiture at the time of

4 sentencing, and any defects that may pertain to the forfeiture.

5       Defendant waives further notice of any federal, state or local proceedings

6 involving the forfeiture of the seized assets Defendant is agreeing to forfeit in this

7 Plea Agreement.

8       17.    Restitution

9       The United States and Defendant agree that restitution is appropriate and

10 mandatory, without regard to Defendant's economic situation, pursuant to 18 U.S.C.

11 §§ 3663A, 3664, for the offense conduct to which Defendant has pled guilty for all

12 victims, as defined by 18 U.S.C. § 3663A(a)(2), who were directly and proximately

13 harmed by the offense conduct, including any representatives of any victim's estate

14 pursuant. Furthermore, pursuant to 18 U.S.C. § 3663A(a)(3), Defendant voluntarily

15 agrees to pay restitution for all losses, as defined by 18 U.S.C. § 3663A(b)(2)-(4),

16 caused by Defendant's individual conduct, in exchange for the United States not

17 bringing additional potential charges, regardless of whether counts associated with

18 such losses will be dismissed as part of this Plea Agreement.

19       With respect to restitution, the United States and Defendant agree to the

20 following:

21       a.    Restitution Amount and Interest

22       The United States and Defendant stipulate and agree that, pursuant to

23 18 U.S.C. §§ 3663, 3663A and 3664, the Court should order restitution in an amount

24 to be determined at sentencing, and that any interest on this restitution amount, if any,

25 should be waived.

26       The United States and Defendant stipulate and agree that restitution shall be

27 ordered to J.N., G. N.-S., any representative of J.N.'s estate, any representative of G.

28

N.-S.'s estate, K.B., J.C., and/or any third-party compensating the victims or their estates, including Crime Victim's Compensation. 18 U.S.C. § 3664(j)(1).

The parties further agree that the United States will recommend that the full amount of restitution entered against Defendant, or an appropriate portion, be ordered to be paid jointly and severally with any other individual(s) who is found liable for the loss(es) to the aforementioned victims in accordance with 18 U.S.C. § 3664(h).

        b.   <u>Payments</u>

To the extent restitution is ordered, the United States and Defendant agree that the Court will set a restitution payment schedule based on Defendant's financial circumstances. 18 U.S.C. § 3664(f)(2), (3)(A). Regardless, Defendant agrees to pay not less than 10% of Defendant's net monthly income towards restitution.

        c.   <u>Treasury Offset Program and Collection</u>

Defendant understands the Treasury Offset Program ("TOP") collects delinquent debts owed to federal agencies. If applicable, the TOP may take part or all of Defendant's federal tax refund, federal retirement benefits, or other federal benefits and apply these monies to Defendant's restitution obligations. 26 U.S.C. § 6402(d); 31 U.S.C. § 3720A; 31 U.S.C. § 3716.

Defendant understands that the United States may, notwithstanding the Court-imposed payment schedule, pursue other avenues to ensure the restitution obligation is satisfied, including, but not limited to, garnishment of available funds, wages, or assets. 18 U.S.C. §§ 3572, 3613, and 3664(m). Nothing in this acknowledgment shall be construed to limit Defendant's ability to assert any specifically identified exemptions as provided by law, except as set forth in this Plea Agreement.

Until Defendant's fine and restitution obligations are paid in full, Defendant agrees fully to disclose all assets in which Defendant has any interest or over which Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or third party.

Until Defendant's fine and restitution obligations are paid in full, Defendant agrees to provide waivers, consents, or releases requested by the U.S. Attorney's Office to access records to verify the financial information.

> d.     <u>Notifications and Waivers</u>

Defendant agrees to notify the Court and the United States of any material change in Defendant's economic circumstances (e.g., inheritances, monetary gifts, changed employment, or income increases) that might affect Defendant's ability to pay restitution. 18 U.S.C. § 3664(k). Defendant also agrees to notify the United States of any address change within 30 days of that change. 18 U.S.C. § 3612(b)(1)(F). These obligations cease when Defendant's fine and restitution obligations are paid in full.

Defendant acknowledges that the Court's decision regarding restitution is final and non-appealable; that is, even if Defendant is unhappy with the amount of restitution ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or restitution order.

> 18.     <u>Additional Violations of Law Can Void Plea Agreement</u>

The United States and Defendant agree that the United States may, at its option and upon written notice to Defendant, withdraw from this Plea Agreement or modify its sentencing recommendation if, prior to the imposition of sentence, Defendant is convicted of any criminal offense or tests positive for any controlled substance.

> 19.     <u>Waiver of Appeal Rights</u>

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court.

Defendant expressly waives all of Defendant's rights to appeal Defendant's conviction and the sentence the Court imposes.

Defendant expressly waives Defendant's right to appeal any fine, term of supervised release, or restitution order imposed by the Court.

PLEA AGREEMENT - 24

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

20.    Compassionate Release

In consideration for the benefits Defendant is receiving under the terms of this Plea Agreement, Defendant expressly waives Defendant's right to bring any motion for Compassionate Release other than a motion arising from one of the specific bases set forth in this paragraph of this Plea Agreement. The United States retains the right to oppose, on any basis, any motion Defendant files for Compassionate Release.

The only bases on which Defendant may file a motion for Compassionate Release in the Eastern District of Washington are the following:

    a.    Medical Condition of Defendant

        i.    Defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia; or

        ii.    Defendant is suffering from a serious physical or medical condition, a serious functional or cognitive impairment, or deteriorating physical or mental health because of the aging

process that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which Defendant is not expected to recover.

    b.   <u>Age of Defendant</u>

        i.   Defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process; and has served at least 10 years or 75 percent of Defendant's term of imprisonment, whichever is less; or

        ii.   Defendant is at least 70 years old and has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which Defendant is imprisoned.

    c.   <u>Family Circumstances</u>

        i.   The caregiver of Defendant's minor child or children has died or become incapacitated, and Defendant is the only available caregiver for Defendant's minor child or children; or

        ii.   Defendant's spouse or registered partner has become incapacitated, and Defendant is the only available caregiver for Defendant's spouse or registered partner.

    d.   <u>Subsequent Reduction to Mandatory Sentence</u>

        i.   Defendant pleaded guilty to an offense which, on the date of Defendant's guilty plea, carried a mandatory minimum sentence; and

        ii.   after the entry of judgment, the length of the mandatory minimum sentence for Defendant's offense of conviction was reduced by a change in the law; and

   iii.  the application of the reduced mandatory minimum sentence would result in Defendant receiving a lower overall sentence.

  e. Ineffective Assistance of Counsel

   i.  Defendant seeks Compassionate Release based on a claim of ineffective assistance of counsel arising from information that Defendant both

    1. did not know at the time of Defendant's guilty plea, and

    2. could not have known, in the exercise of due diligence, at the time the Court imposed sentence.

21. Withdrawal or Vacatur of Defendant's Plea

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

  a. this Plea Agreement shall become null and void;

  b. the United States may prosecute Defendant on all available charges;

  c. The United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

  d. the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and/or defenses Defendant might have to the United States' decisions to seek, reinstate, or reinitiate charges if a

PLEA AGREEMENT - 27

count of conviction is withdrawn, set aside, vacated, reversed, or dismissed, including any claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including but not limited to, alleged violations of any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

22.    Integration Clause

The United States and Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and Defendant, and no other promises, agreements, or conditions exist between the United States and Defendant concerning the resolution of the case.

This Plea Agreement is binding only on the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities.

The United States and Defendant agree that this Agreement cannot be modified except in a writing that is signed by the United States and Defendant.

Approvals and Signatures

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____        3/7/23
Richard R. Barker                       _____
Assistant United States Attorney        Date

_____        3-7-2023
Michael J. Ellis                        _____
Assistant United States Attorney        Date

PLEA AGREEMENT - 28

I have read this Plea Agreement and I have carefully reviewed and discussed every part of this Plea Agreement with my attorney. I understand the terms of this Plea Agreement. I enter into this Plea Agreement knowingly, intelligently, and voluntarily. I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. No one has threatened or forced me in any way to enter into this Plea Agreement. I agree to plead guilty because I am guilty.

_____          3-7-23
Curry A. Pinkham                          Date
Defendant

I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept Defendant's guilty plea.

_____          3-7-2023
Zachary L. Ayers                          Date
Attorney for Defendant

PLEA AGREEMENT - 29